# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01733-COA

BOBBY LEE CHAIN JR., IN HIS CAPACITY AS THE EXECUTOR OF THE ESTATE OF BETTY CHAIN, DECEASED                    APPELLANT

v.

ORMONDE PLANTATION INC., CHARLES T. FINNEGAN, KENNY DUFF JR., AND ALBEN N. HOPKINS                    APPELLEES

DATE OF JUDGMENT:           11/08/2017
TRIAL JUDGE:                HON. E. VINCENT DAVIS
COURT FROM WHICH APPEALED:  ADAMS COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:    SAMUEL S. McHARD
                            PAUL MARION ANDERSON
ATTORNEYS FOR APPELLEES:    ROBERT T. SCHWARTZ
                            CHRISTIAN J. STRICKLAND
                            EDGAR HYDE CARBY
NATURE OF THE CASE:         CIVIL - REAL PROPERTY
DISPOSITION:                REVERSED AND REMANDED - 03/31/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., WESTBROOKS AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.    Betty Chain (Chain) filed a complaint in the Adams County Chancery Court against Ormonde Plantation Inc. (Ormonde), a closely-held Mississippi corporation, and the majority shareholders of Ormonde:  Charles T. Finnegan, Kenny Duff Jr., and Alben N. Hopkins.  She filed the action to judicially dissolve the corporation, asserting related claims of conspiracy and requesting partition and a declaratory judgment.  Chain's husband, Bobby L. Chain, had been a shareholder, but after he passed away, she became the successor-in-

interest to his share. The primary asset Ormonde owned was a tract of real property in Adams County utilized for recreation and hunting.

¶2. The complaint arose when Chain desired to sell her share of Ormonde contrary to the procedure described in the Shareholders' Agreement (Agreement). Chain sued to dissolve the corporation because she alleged the Agreement regarding the buyout of her share was oppressive. In response, Ormonde filed a motion to dismiss the complaint based on numerous arguments. The chancery court granted the motion, and Chain appealed. Chain subsequently passed away during the pendency of this appeal, and this Court ordered that Bobby Lee Chain Jr. (Chain Jr.) be substituted as a party. We find that the complaint stated a claim that the Agreement was oppressive as applied. Accordingly, we reverse and remand for proceedings consistent with this opinion.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. Ormonde was incorporated in 1987 and has been operating as a hunting, fishing, and recreational organization used by shareholders and their guests. The primary asset Ormonde owned was a tract of real property consisting of 1,841 acres located in Adams County, Mississippi. In 1999, the then shareholders of Ormonde, including Chain's predecessor-in-interest, Bobby L. Chain, executed the Agreement and agreed to abide by the corporate bylaws (Bylaws).

¶4. In 2014, Bobby L. Chain passed away, and his wife acquired his interest in Ormonde. At the time, the corporation was held by four shareholders, each having a twenty-five percent interest in the corporation: Chain, Finnegan, Duff, and Hopkins. It is undisputed

2

Chain was not a direct owner of the property or a tenant in common, and she never saw or read the executed Agreement. On March 2, 2017, Chain sent a letter to Ormonde's president, Finnegan, requesting that her letter be accepted as "notice of [her] intention and an effort to fairly resolve [her] stock interest in Ormonde Plantation, Inc." She requested that the shareholders agree to an appraisal of the property so that she could receive fair compensation for her twenty-five percent share due to her failing health. Chain wrote:

> I want to request that the shareholders agree on an appraiser, that a proper appraisal be done of the property, and that I am paid accordingly. The current method used to determine the value is totally subjective, without validation, and unfair. After thirty years, it is time to have a proper appraisal done so that each shareholder can know the true value of the land. This appraisal will either confirm or change the value determined by the current method, and the value confirmed by properly recognized methods should stand.

¶5. On March 14, 2017, the majority shareholders advised Chain via telephone that there would be a "regular" shareholders meeting held seven days later on March 21, 2017.[1] This was not an annual meeting.[2]

¶6. On March 21, 2017, a "regular" shareholders' meeting was held, and Chain's letter was discussed. Minutes of the meeting reflect that Chain's son, Chain Jr., stopped by the meeting before it began to discuss matters pertaining to his mother. Chain Jr. stated he advised the shareholders that his mother had received a purchase offer of $1.5 million for her one-quarter share of Ormonde property. Under the Agreement, however, if Chain

---

[1] Chain contends that this notice violated the ten-day notice requirement in the Bylaws for special meetings, but this meeting was deemed "regular"; and in any event, the notice requirement for annual and special meetings can be waived under the Bylaws.

[2] The Bylaws state that the "regular annual meeting of the shareholders" is held on the fourth Tuesday of April each year, but the Bylaws state that the date may be changed.

3

wanted to dispose or sell her share of Ormonde, she had to first offer to sell it to the other shareholders at the price they set at their last annual meeting. Pertinent parts of the Agreement are the following paragraphs:

1.      No Shareholder (or the estate of any deceased Shareholder) may transfer, encumber or dispose of any of the shares of stock in the Corporation except upon the terms and conditions herein set forth. The restrictions imposed by this Agreement shall apply to all shares owned by any present or future Shareholder even though said shares may be acquired after the date hereof.

. . . .

3.      If a Shareholder should desire to dispose of his share of stock in the Corporation during his lifetime, he shall first offer to sell the share to the Corporation at the price determined in accordance with paragraph 7 hereof. Notice of his desire to sell shall be given to the Corporation by the Shareholder, in writing. The Corporation shall have ninety (90) days in which to exercise their option to purchase said share. Each Shareholder hereby binds himself (or herself) to vote his share of stock to cause the Corporation to purchase (redeem) the stock so offered . . . .

. . . .

5.      In the event of the death of any Shareholder, it is agreed that the legatee, heir, estate, or legal representative of said deceased Shareholder shall have the option to sell the deceased Shareholder's share of stock to the Corporation at the price determined in accordance with paragraph 7 hereof for the predetermined value . . . .

. . . .

7.      The method of determining the price of a share of stock to be purchased pursuant to the terms of this Agreement shall be as follows:

7.1.    The Corporation, at its annual meeting, shall require each shareholder to provide by a signed and dated secret ballot a price which each respective shareholder believes to be the value of one share of stock for the following twelve (12) months, (unless amended at a duly called meeting of the Shareholders). Upon receiving the values of each of the Shareholders, the

4

Secretary of the Corporation shall present to the Shareholders the amount of each value submitted, then shall remove the highest and lowest of the values from the amounts submitted by each Shareholder, and then averaging the remaining values, with the resulting total being the price for a share of stock for the following twelve (12) months for the purposes set forth in this Shareholders Agreement.

The other shareholders claimed the $1.5 million was "more than it was worth," and they refused to permit Chain's acceptance of the offer, which was then withdrawn. Instead, the shareholders allegedly performed an evaluation of the stock under the procedure of the Bylaws and Agreement. The shareholders determined the future value of the stock to be $900,000. Although the other shareholders claimed the valuation was done according to the Agreement's procedures, they do not state the amount was set at a prior annual meeting for the entire year; instead, the amount appears to have been set just to deal with Chain's sale.

¶7. Next, Chain's letter and her buyout request were discussed. The shareholders agreed that the buyout was governed by the Bylaws and Agreement. The minutes quoted the pertinent part of paragraph three of the Agreement, which provided that if the shareholder desired to sell his share of stock, he should first offer to sell it to the corporation at the price determined by paragraph seven. The minutes stated that "[a]fter thorough discussion, it was unanimously agreed that Ormonde had no alternative but to follow the rules and regulations with regard to the evaluation and buyout requirements" established under the Bylaws and Agreement. The shareholders determined the buyout price for Chain's share was $900,000.[3]

---

[3] Chain alleges in her complaint that since the death of her husband, the three other shareholders have regularly discussed Ormonde business outside of shareholder meetings and vote identical amounts on "low-ball" estimates for the value of the stock.

Ormonde complains that due to monetary greed, Chain is attempting "to usurp a valid

5

On March 23, 2017, Ormonde's corporate secretary, Hopkins, sent Chain and the two other shareholders a cover letter attaching the minutes of the March 21 shareholders' meeting. Ormonde contends this mailing gave Chain notice of its intent to purchase her stock.

¶8. On May 1, 2017, Chain sued Ormonde and its majority shareholders for corporate dissolution, conspiracy, partition, and a declaratory judgment finding the Agreement void. Attached to the complaint was the Agreement, Bylaws, a boundary-line agreement, the March 2, 2017 letter from Chain to Ormonde's president, and the March 21 minutes. Chain alleged that the shareholders violated their fiduciary duties by illegally and fraudulently oppressing Chain as a minority shareholder in violation of the Business Corporation Act's section on judicial dissolution of a corporation, Mississippi Code Annotated section 79-4-14.30(a)(2)(ii) (Rev. 2013), "in a blatant attempt to improperly squeeze out/freeze out Betty." Chain also alleged damages as a result of the shareholders conspiring against her, and she requested the court to partition the property as a result of their misconduct. Finally, Chain requested a declaratory judgment stating the Agreement is void.

¶9. In June 2017, Ormonde answered the complaint and filed a motion to dismiss, claiming Chain's complaint must be dismissed because of an improper summons and complaint, lack of standing to pursue a partition suit as well as the other claims, and failure to state a claim for conspiracy. Additionally, Ormonde argued Chain's claims were barred by Mississippi Code Annotated section 79-4-14.34 (Rev. 2013), the statute governing

---

shareholders' agreement signed by her late husband in an attempt to obtain additional monies from the remaining shareholders to which she is not entitled." Ormonde claims Chain would rather sell her share to a stranger in order to benefit financially than abide by the Agreement.

election to purchase shares in lieu of dissolution; the existing Agreement; and the statute of limitations, waiver, laches, and the manifest assent of Chain or Chain's husband. The three majority shareholders joined Ormonde's motion. Chain responded to the motion, and a hearing was held. The chancery court granted the motion to dismiss as to all of Chain's claims. Among other matters, the court found Chain's requests for declaratory relief and dissolution of a corporation were statutorily precluded by section 79-4-14.34 and Mississippi Code Annotated section 79-4-6.27 (Rev. 2013) (governing buyouts at fair value of shares and restriction on transfer of shares), applicable law, and the Agreement, to which all the shareholders were bound. Chain appealed,[4] raising seventeen issues. However, we address only the dissolution-of-a-corporation claim, upon which all of Chain's other claims are contingent.

## STANDARD OF REVIEW

¶10.    A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Mississippi Rules of Civil Procedure tests the legal sufficiency of the complaint. An appellate court reviews such matters of law under the de novo standard. *Rose v. Tullos*, 994 So. 2d 734, 737 (¶11) (Miss. 2008). When considering a motion to dismiss, "[t]he allegations in the complaint must be taken as true, and there must be no set of facts that would allow the plaintiff to prevail." *Id.* The appellate court need "not defer to the trial court's ruling." *Id.*

## ANALYSIS

---

[4] The Appellees filed a suggestion of death, stating that Betty Chain passed away in December 2018. Chain Jr. moved to be substituted as a party in his capacity as the executor of his mother's estate, and this Court granted the motion.

¶11. Chain's claim for dissolution of a corporation arises under section 79-4-14.30(a)(2)(ii), which provides that a court may dissolve a corporation if it is established that "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive or fraudulent." Once a shareholder has requested judicial dissolution of a corporation, "the corporation or other existing shareholders 'may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares,' in lieu of dissolution." *In re Hardin*, 158 So. 3d 341, 345 (¶14) (Miss. Ct. App. 2014) (quoting Miss. Code Ann. § 79-4-14.34(a)). "If the parties cannot reach an agreement as to the fair value of the shares to be purchased, the court, upon application of any party, shall stay the proceedings and make a determination as to the *fair value* of the petitioner's shares." *Id.* at 345-46 (¶14) (emphasis added) (citing Miss. Code Ann. § 79-4-14.34(d)). Section 79-4-6.27(d) governs the restrictions on the transfer of shares made by articles of incorporation, bylaws, or shareholder agreements. Shareholders may include a requirement that the corporation or shareholders must "approve the transfer of restricted shares, if the requirement is not manifestly unreasonable." Miss. Code Ann. § 79-4-6.27(d)(3).

¶12. Chain's complaint contends the three other shareholders "violated their fiduciary duties, oppressed [Chain] as a minority shareholder, and acted in a manner that [was] illegal, oppressive, and/or fraudulent in violation of [section] 79-4-14.30 in a blatant attempt to improperly squeeze out/freeze out [Chain]." She contends that the other shareholders did not execute secret ballots but gave identical "lowball guestimates" of the value. On appeal, Chain explains that the majority shareholders forced the sale of Chain's share based upon

8

the Agreement, which is unfair and unreasonable. She claims the Agreement's restrictive provisions for the transfer of stock are "manifestly unreasonable" and contrary to section 79-4-6.27(d)(3), thereby enforcing an "inadequate valuation of close-corporation stock."

¶13. In granting the dismissal of this claim and the other claims, however, the chancery court was not convinced that the other three shareholders had acted in a manner that was fraudulent or oppressive. The chancery court opined that it even if Chain could prove these allegations, the actions were permissible under section 79-4-14.34, allowing the remaining shareholders to purchase shares at a "fair value" instead of dissolution. Additionally, the chancery court found Ormonde properly elected to purchase Chain's shares under the restrictions of the Agreement, in accordance with section 79-4-6.27. The court found that Chain's March 2, 2017 letter showed she had knowledge of these restrictions for the transfer of shares and that the Agreement controlled. However, the court did not provide any further analysis of the matter. In support of dismissing this claim, the court cited *Martindale v. Hortman, Harlow, Bassi, Robinson & McDaniel PLLC*, 119 So. 3d 338, 340 (¶1) (Miss. Ct. App. 2012), where a law firm was buying out an expelled member's shares. In that case, the PLLC's operating agreement included a formula that set the value of each members share in the firm according to the percentage owned. Under the terms of this agreement, the departing member was offered $19,800 for his shares. *Id.* However, he complained that the amount was unjust because it did not reflect his fair share of the law firm. *Id.* at (¶3). The firm filed for declaratory relief, claiming they had satisfied their contractual obligations to the expelled member. *Id.* at (¶4). The chancellor granted partial summary judgment in the

9

firm's favor for this claim, finding the price as calculated under the agreement controlled, and this Court affirmed. *Id.* at (¶1). *Martindale*, however, is inapplicable here because it was not a case about dissolving a corporation where, if oppression is proved, the "fair value" of the shares must be established. In fact, the chancery court did not discuss how *Martindale* applied to this case or the supposed reasonableness of the Agreement under *Fayard v. Fayard*, 293 So. 2d 421, 423-24 (Miss. 1974).

¶14.    Chain makes several arguments on appeal related to the dismissal of her dissolution-of-corporation claim. She argues the chancery court misinterpreted section 79-4-14.34(a); Ormonde's March 23, 2017 letter did not constitute an election to purchase Chain's shares or bar her claim; Chain's complaint was not barred by the Agreement; and the Agreement's transfer of share restrictions were unreasonable. We find her complaint properly states a claim for dissolution of the corporation under section 79-4-14.30(a)(2)(ii) because the terms were oppressive to Chain. The other shareholders offered her only $900,000 for her share, when she allegedly had been offered $1.5 million by an outsider, and there is a question of fact whether the price had been previously set at an annual meeting by secret ballot. Chain further alleges that the other shareholders colluded to set an unreasonably low price for her shares.

¶15.    Closely held corporations "frequently originate in the context of relationships personal in nature, often undertaken by family members or friends," as is the case here. *Fought v. Morris*, 543 So. 2d 167, 171 (Miss. 1989). The supreme court has stated that it is particularly important for majority shareholders in a closely held corporation to adhere to

their fiduciary duty with respect to the minority shareholders, who have an acute vulnerability in such a corporation. *Id.*; *see also* 1A Fletcher Cyc. Corp. § 70.10, Westlaw (database updated Sept. 2019) ("[S]hareholders in a close corporation stand in a fiduciary relationship to each other."); 12B Fletcher Cyc. Corp. § 5810, Westlaw (database updated Sept. 2019) ("The shareholders of a close corporation may be subject to a particularly rigorous fiduciary standard . . . ."). "[T]he law requires that [in a closely-held corporation,] the majority's action[s] be 'intrinsically fair' to the minority interest." *Fought*, 543 So. 2d at 170; *Investor Resource Servs. Inc. v. Cato*, 15 So. 3d 412, 422 (¶26) (Miss. 2009) (majority's actions must be intrinsically fair to minority). "[E]nhanced fiduciary duty has been applied in . . . the few states that do[] not list oppression or similar grounds for dissolution . . . [as] a way of addressing the dilemma of minority shareholders in a close corporation." 2 F. Hodge O'Neal and Robert B. Thompson, *Close Corp and LLCs: Law and Practice*, § 9.21 (3d ed. 2018), Westlaw (database updated July 2019). Indeed, there is a growing recognition of enhanced fiduciary duty in closely held corporations. *Id.* A common-law claim for fiduciary duty is similar to a statutory claim of oppression. *Id.* Here, Chain pleaded in her complaint the common-law claim of breach of fiduciary duty. *See Scafidi v. Hille*, 180 So. 3d 634, 654 (¶¶68-69) (Miss. 2015) (breach of fiduciary duty claim in closely-held corporation found sufficient even though such claim was not named in complaint).

¶16.    The dissent claims Chain fails to state a claim upon which relief can be granted because shareholders do not have a right to the fair market value of shares and because the

11

failure to receive such does not constitute an unreasonable restriction on the sale of the stock. While we do not disagree with the dissent that the Agreement may be valid on its face, Chain states a claim because the Agreement may be invalid *as applied* due to oppressive or fraudulent conduct, in which case she would be entitled to the fair value under section 79-4-14.34. It is too early in the litigation process to determine. Additional facts through discovery need to be examined before a determination as to the merit of her claims is made.

¶17.    Even if setting the property's value by the manner of the Agreement is intrinsically fair and not unreasonable, there could still be a question of fact about whether the valuation procedure was performed in good faith. For example, the Bylaws state the corporate annual meeting is to be held in April of each year but may be changed. The meeting on March 21 was obviously not an annual meeting but held in response to Chain's March 2 letter requesting an appraisal of the property. The March 21 minutes show the majority shareholders allegedly performed the share evaluation according to the provisions of the Agreement. However, there is nothing in the record to show whether an evaluation of shares was performed for the previous year and what that valuation was. Discovery may show the valuation was not done by secret ballot or set for the entire year. These are all questions of fact that are sufficient to show the valuation may not have been in accordance with the Agreement and give rise to a claim for breach of fiduciary duty to the minority shareholders.

¶18.    In this instance, the Agreement, as written, is not necessarily oppressive; however, Chain's complaint alleges, in effect, that it was oppressive as applied to her. She alleges that

the ballots were not secret and that the value was set just for Chain's situation and was not set at an annual meeting. Accordingly, Chain alleged a proper cause of action for the dissolution of a corporation under section 79-4-14.30(a)(2)(ii). However, we make no determination about the success of Chain's claim. The "fair value" of the shares under the Agreement is a question of fact. The chancery court apparently assumed that "fair value" would mean the value as set in paragraph seven of the Agreement; however, in order to reach the point where the fair value would be relevant, Chain will have to prove—not just state a claim—that the amount set was oppressive. Therefore, it would not be a valid statement of "fair value."

¶19.    In a factually similar case, the Mississippi Supreme Court has held that a stock transfer restriction was unenforceable because it was "grossly inadequate consideration" in *Mathews Brake Hunting & Fishing Club Inc. v. Sneed*, 475 So. 2d 811, 813 (Miss. 1985). There, a small corporation was formed for the purpose of acquiring land and operating a hunting and fishing club for the corporation's twelve shareholders and their guests. *Id.* at 812. Four years after the corporation was formed, the corporate bylaws were amended to include a stock restriction that stated, upon a shareholder's death, his or her shares would be surrendered to the corporation in exchange for the "book value," which was the value determined by shareholder vote at the annual meeting. *Id.* The amendment was adopted by a unanimous vote of the shareholders present; however, Dr. Woodford Sneed, a charter member, was not present. *Id.* Upon Sneed's death years later, the corporation offered his estate's executor the book value of the shares, or $4,132.89. *Id.* The estate refused the

13

offer, citing the dramatic increase in the land's value. *Id.* at 812-13. The corporation sued for specific performance under the bylaws for surrender of the stock for the book value. *Id.* at 812. At trial, Sneed's estate offered uncontradicted expert witness testimony that the "duck-hunting land had appreciated dramatically in recent years due to 'tremendous demand,'" and Sneed's share would be worth $45,325. *Id.* at 812-13. The chancellor held for Sneed, stating that "the bylaw in question had been invalidly adopted and could not be enforced under any contractual theory because the agreed-upon price constituted grossly inadequate consideration." *Id.* at 813.

¶20. Similarly, here the $600,000 difference between the majority shareholders' valuation of Chain's one-quarter interest in Ormonde and the $1.5 million offer Chain allegedly received could be considered "grossly inadequate consideration"; however, Chain had no opportunity to present expert testimony as to the property's objective value due to the dismissal. Accordingly, Chain should be allowed to present such testimony so the finder of fact can decide whether the majority shareholders offered "grossly inadequate consideration."

¶21. Because Chain's claim for the tort of conspiracy stems from whether there was any injury from the oppression, it should not be dismissed—nor should the possibility of partition due to alleged wrongdoing on the part of the shareholders. Finally, regarding a declaratory judgment to void the Agreement and other matters, whether the Agreement, as applied, is oppressive is a question of fact for the chancery court to decide. For these reasons, we reverse the dismissal of Chain's complaint and remand to the chancery court for

14

further proceedings consistent with this opinion.

¶22.   **REVERSED AND REMANDED.**

**J. WILSON, P.J., GREENLEE, WESTBROOKS AND LAWRENCE, JJ., CONCUR.   C. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.   McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY TINDELL, McDONALD AND McCARTY, JJ.**

**CARLTON, P.J., DISSENTING:**

¶23.   I would affirm the chancery court's decision dismissing Chain's complaint for failure to state a claim upon which relief can be granted.[5]  Chain claims in her complaint that the restriction at issue in the Shareholders' Agreement (Agreement) is manifestly unreasonable because it is allegedly a total restriction against a fair market sale to oppress minority shareholders contrary to minority shareholders' rights.  However, the complaint fails to allege a claim upon which relief can be granted because shareholders do not have a right to a fair market sale.  Statutory law and precedent reflect that the failure to receive fair market

---

[5] The standard of review regarding a motion for dismissal under Mississippi Rule of Civil Procedure 12(b)(6) is as follows:

> A motion for dismissal under Miss. R. Civ. P. 12(b)(6) raises an issue of law. . . .   When considering a motion to dismiss, the allegations of the complaint must be taken as true and the motion should not be granted unless it appears beyond reasonable doubt that the plaintiff will be unable to prove any set of facts in support of her claim. . . .  In reviewing the grant of a motion to dismiss, this Court conducts a de novo review.

*Liggans v. Coahoma Cty. Sheriff's Dep't*, 823 So. 2d 1152, 1154 (¶5) (Miss. 2002). "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Cmty. Hosp. of Jackson v. Goodlett ex rel. Goodlett*, 968 So. 2d 391, 396 (¶9) (Miss. 2007), *overruled on other grounds by Wimley v. Reid*, 991 So. 2d 135, 138 (¶16) (Miss. 2008).

value under a shareholders' agreement does not constitute a manifestly unreasonable restriction or price. Chain does not allege that the amount the other shareholders paid her for her shares was below book value or lesser than that amount originally paid by her deceased husband from whom she inherited her shares. As such, even if Chain could show "oppressive" conduct on the part of the other shareholders with respect to her petition for dissolution of the corporation, *see* Miss. Code Ann. § 79-4-14.30(a)(2)(ii), she cannot show any damages attributable to such conduct because section 79-4-14.34 allows "one or more [remaining] shareholders [to] elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares."

¶24. Restrictions on the transfers of share are permissible and enforceable and are allowed by Mississippi statute. *See* Miss. Code Ann. § 79-4-6.27(a) ("The articles of incorporation, bylaws, an agreement among shareholders or an agreement between shareholders and the corporation may impose restrictions on the transfer or registration of transfer of shares of the corporation. . . ."); *Id.* § 79-4-6.27(d) ("A restriction on the transfer or registration of transfer of shares may . . . [o]bligate the shareholder first to offer the corporation or other persons (separately, consecutively or simultaneously) an opportunity to acquire the restricted shares"); *see also West v. West*, 88 So. 3d 735, 738 (¶2) (Miss. 2012) ("We hold today that statutory restrictions on the transfer of restricted shares of corporate stock apply to both voluntary and involuntary transfers of the shares[.]" (citation omitted)).

¶25. The restrictions in this case were clearly identified in the Agreement and were not

16

shown to be manifestly unreasonable.[6]  The record reflects, and the chancery court found, that Chain's March 2, 2017 letter showed that she had knowledge of the restrictions on the transfer of the shares.  Further, as noted, nowhere in her complaint does Chain allege that the amount the other shareholders paid her for her shares was below book value or lesser than that amount originally paid by her deceased husband from whom she inherited her shares.  She merely claims that she unfairly received less from the members than what she could have received from a third party.

¶26.    In analyzing this issue, the chancery court discussed *Martindale v. Harlow, Bassi, Robinson & McDaniel PLLC*, 119 So. 3d 338 (Miss. Ct. App. 2012), a case in which this Court addressed a similar situation where a disqualified member (Martindale) of a professional limited liability company claimed that he was offered an unfair price for his share in the law firm.  *Id.* at 340-41 (¶¶3-5).  By law, a PLLC must acquire the membership interests of disqualified members.  *Id.* at 345 (¶20).  In its opinion, the chancery court observed:

> Like Betty Chain, Martindale argued that the other members violated their duty of intrinsic fairness to him. The Court of Appeals held that "[i]f a price for the membership interest is established in accordance with the certificate of formation or written operating agreement or by private agreement, that price controls." [*Martindale*, 119 So. 3d at 345 (citations omitted) (emphasis added).  "Because [the firm] could not have acted in bad faith by exercising a contractual right, we find the firm did not breach its implied duty of good faith and fair dealing under the operating agreement." *Id.*

(Emphasis added by the chancery court).  Applying the same reasoning in Chain's case, the

---

⁶ *See* Miss. Code Ann. § 79-4-6.27(d)(1)-(4); 3 Jeffrey Jackson et al., *Encyclopedia of Mississippi Law* § 22:83, at 615 (2d ed. 2016).

chancery court found that with respect to Chain, the terms of the Agreement controlled, and there was no merit in her breach-of-fiduciary-duty allegations against the other members. The chancery court therefore found that "Betty Chain's claim seeking the dissolution of the corporation and seeking a declaration that the Agreement is void should be dismissed." I find no error in this determination.

¶27. The chancery court also found that Chain's complaint was barred by the plain terms of the Agreement, which the chancery court found was a valid and enforceable contract. As her deceased husband's successor-in-interest, Chain was bound by the Agreement as a matter of law. *See In re Estate of Harris*, 840 So. 2d 742, 747 (¶28) (Miss. Ct. App. 2003) (Successors-in-interest "are bound by the terms of the agreement just as [their predecessor] would have been had he been still alive."); *see also Ballard v. Commercial Bank of DeKalb*, 991 So. 2d 1201, 1206 (¶24) (Miss. 2008) (A party "is bound as a matter of law by what he signed."). I find no error in the chancery court's finding that "the Agreement must be enforced as written, and Betty Chain's attempt to usurp the same by her complaint is without merit." *See Steele v. Carmichael*, 249 Miss. 574, 583, 163 So. 2d 663, 665 (1964) (ordering specific performance of shareholders' agreement providing that if either party desired to liquidate his stock, the parties would sell together for the same agreed price; and finding that the unilateral sale of stock by one party was not permitted).

¶28. As stated, I would affirm the chancery court's judgment because I find that Chain's complaint fails to state a claim for relief for manifestly unreasonable restrictions on the sale of her deceased husband's stock. Indeed, as reflected in the Mississippi Business

18

Corporations Act, *see* section 79-4-6.27, and as articulated in other jurisdictions, the law "condemns 'not a *restriction* on transfer, . . . but an effective *prohibition* against transferability itself." *Wildenstein & Co. v. Wallis*, 595 N.E.2d 828, 834 (N.Y. 1992) (quoting *Allen v. Biltmore Tissue Corp.*, 141 N.E.2d 812, 816 (N.Y. 1957)); *see generally*, Mark S. Rhodes, *Transfer of Stock* § 4:4, at 147-54 (7th ed. 2006) (citing cases). In contrast to an effective prohibition on transferability, which is not the case here, "[s]hare transfer restrictions are widely used by both publicly held and closely held corporations for a variety of appropriate purposes." 12 William M. Fletcher, *Cyclopedia of the Law of Corporations* § 5454, at 131 (2012). Such restrictions "typically serve as an important device to ensure that current shareholders can control the ownership and management of the corporation. . . . Transfer restrictions not only protect the corporation from potential disruption but [also] ensure [that]. . . the estate of a deceased shareholder. . . will be able to liquidate the shares." *Id.* at 131-32 (citing cases); *see Lawson v. Household Fin. Corp*., 152 A. 723, 727 (Del. 1930) ("Restrictions . . . reasonably protecting incorporators or stockholders in their interests by permitting them first to purchase stock offered for sale, should be held lawful as promotive of good management and sound business enterprise."); *see also Bruns v. Rennebohm Drug Stores Inc.*, 442 N.W.2d 591, 594 (Wis. Ct. App. 1989) (recognizing that the need for stock transfer restrictions is primarily "to insure that the 'harmony and balance' of the business organization will not be disturbed by the unwelcome intrusion of strangers").

¶29. In this case, the record reflects, and the chancery court found, that there was a valid first-option restriction on transfer of the stock, as delineated in the enforceable Agreement.

In *Fayard v. Fayard*, 293 So. 2d 421 (Miss. 1974), the Mississippi Supreme Court recognized that "several types of restraints on stock transfers have emerged as reasonable under circumstances persuasive of validity[, including]. . . first option provisions." *Id.* at 423; *see generally* 1 F. Hodge O'Neal and Robert B. Thompson, *Close Corporations and LLCs: Law and Practice* § 7:17, at 7-85 (Rev. 3d ed. 2018) ("The legality of first option provisions, currently the most popular of the restrictions on transferability, has been established in most jurisdictions either by judicial decision or by legislation.") (citing cases).

¶30.     With respect to the particular circumstances in this case, "[t]he transfer price in an option to purchase the shares of a holder who dies is usually fixed at book value or at a price determined by some formula set out in the restrictive provision." 1 O'Neal & Thompson, *supra*, § 7:17, at 7-90.  In this case, Section 7.1 of the Agreement plainly delineated the method for determining the transfer price.  Jurisprudence reflects that options such as these have been upheld in a number of decisions, even where there is "a great disparity between the option price and the then current value of the shares." *Id.*; *see Palmer v. Chamberlin*, 191 F.2d 532, 541 (5th Cir. 1951) (affirming enforcement of first-option provision in corporate by-laws where stock price is determined by formula, despite disparity between the price offered and the true value of the stock); *Nichols Constr. Corp. v. St. Clair*, 708 F. Supp. 768, 771 (M.D. La. 1989) (holding that "the mere failure to pay 'fair value' for stock under a stock redemption agreement" is not "fraud or breach of fiduciary duty"), *aff'd.*, 898 F.2d 150 (5th Cir. 1990); *see also Unigroup Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1221 (8th Cir. 1992) (upholding corporate repurchase provision permitting

20

payment of "book value" and finding that there was no duty to pay "fair value" under that provision); *Kanawha-Roane Lands Inc. v. Burford*, 359 S.E.2d 618, 621 (W. Va. 1987) (recognizing that "most courts have been reluctant to interfere with stock purchase restrictions because of a disparity between the price to be paid and the true value of the shares") (citing cases); *Allen*, 141 N.E.2d at 817 (recognizing that "the validity of the restriction on transfer does not rest on any abstract notion of intrinsic fairness of price. To be invalid, more than mere disparity between option price and current value of the stock must be shown").[7] I would affirm the chancery court's judgment in this case, and therefore I dissent.

**TINDELL, McDONALD AND McCARTY, JJ, JOIN THIS OPINION.**

---

[7] In *Allen*, 141 N.E.2d at 817, the court found that a corporation's first option to purchase stock of a deceased stockholder at the price which it originally received for the stock was reasonable and valid.